IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                        PLAINTIFF

v.          Criminal No. 07-50087-001

JIMMY JOE WATTERS                                               DEFENDANT

### O R D E R

On the 2nd day of July, 2008, defendant's **Motion To Suppress** (document #16) came on for hearing, and from said motion, the response thereto, and the evidence and arguments adduced at the hearing, the Court finds and orders as follows:

1. Defendant is charged with being a felon in possession of a firearm which had traveled in interstate commerce, in violation of **18 U.S.C. §922(g)(1) and §924(a)(2).** He now moves to suppress (a) incriminating statements given at the time of his arrest, contending they were made without the protection of **Miranda** warnings; and (b) items seized in a search of his vehicle which followed the incriminating statements, contending the search was made without a warrant, without consent, and not being incident to a lawful arrest.

The government opposes the motion, contending that the incriminating statements were made in response to questions which fall within the "public safety" exception to **Miranda v. Arizona, 384 U.S. 436 (1966),** and that the search of the vehicle was permitted by Watters' consent.

2. The Supreme Court has recognized a "public safety" exception to the requirement that responses made during custodial interrogation cannot be admitted as evidence against a defendant unless he has first been told of his **Miranda** rights, and has waived them.

> In *Quarles*, the Supreme Court held that there is a public safety exception to the requirement *Miranda* warnings be given before a suspect's answers may be admitted into evidence. In this context, protection of the public safety includes protection of the police officers themselves. The exception does not depend upon the subjective motivation of the questioning officers. Instead, the Court adopted an objective standard: the exception applies when police officers ask questions reasonably prompted by a concern for the public safety. It does not apply to questions designed solely to elicit testimonial evidence from a suspect.

**U.S. v. Liddell, 517 F.3d 1007, 1009 (8th Cir. 2008)**(internal citations and quotation marks omitted).

3. Uncontested evidence at the hearing was as follows. In the early morning hours of August 15, 2007, two Fayetteville Police Department Officers responded to a dispatch alerting them to a problem in a bar known as Ryleigh's on Dickson Street in Fayetteville, Arkansas. The dispatcher was talking to a caller who said that a man at Ryleigh's was trying to purchase methamphetamine, saying that he had a shotgun and that he was "not going back to prison."

Officer Anthony Murphy testified that he spotted a man matching the dispatch description on Ryleigh's catwalk as he approached. This man was defendant, Jimmy Joe Watters. Officer

Murphy engaged Watters in conversation, and found him cooperative, but obviously intoxicated.  While talking with Watters, Officer Murphy obtained a National Crime Information Center ("NCIC") report, and learned that Watters was a sex offender in delinquent status, and had both drug and weapons charges against him.

Officer Murphy decided he needed to find out about whether there was, in fact, a shotgun in the mix.  He asked Watters whether he had said he had a shotgun, and whether he had a gun in his vehicle.  Watters denied having a gun, denied making any statements about weapons or drugs, and said he "didn't do drugs and would never touch meth."  Watters appeared to be getting agitated at this point, and Officer Murphy did not believe these denials.  He placed Watters under arrest for public intoxication, handcuffing his hands behind his back.

At this point, Officer Matthew Wright took over.  Officer Wright testified that he had talked with the person who called the police, and had ascertained that Officer Murphy was talking with the person about whom the call had been made. He then asked Officer Murphy to get Watters' car keys from Watters' girlfriend, while he sat down next to Watters and asked him about having a gun on Dickson Street.  Officer Wright did not read the **Miranda** warnings to Watters because he was concerned about locating the shotgun, if there was one.

-3-

Watters appeared calm to Officer Wright, but concerned about his girlfriend being arrested. He then tried to make a deal with Officer Wright, asking "if I tell you about a gun and some drugs will you let me go?" When Officer Wright said he could not make any deals, Watters asked Officer Wright for a handshake, which was impossible because of the handcuffs, and then for a hug, which Officer Wright gave him. Watters then told Officer Wright that he had a gun in his van, and began talking about the gun and about drugs, continuing as they walked toward the van. Officer Wright testified that he could not get Watters to stop talking so that he could read the **Miranda** rights to him until they got to the van.

At the van, Officer Wright read Watters his **Miranda** rights, and then asked if they could search the van. He told Watters that he did not have to consent to the search, but Watters consented, to the point of insisting on the search, acting as if he "had something on his shoulders." Officer Murphy had already seen a gun stock (the rest of the weapon was covered up by clothing) and a bandolier containing shotgun shells through the window of the van. The van was searched and the shotgun, along with some marijuana and a pipe, were seized. The whole episode lasted less than an hour.

4. Putting the foregoing evidence into context, both Officers testified that the incident occurred just a few days before the fall semester at the University of Arkansas at

Fayetteville was to begin, and at an hour when the bars on Dickson Street were making "last call," patrons were drunk, and fights tended to break out in the Dickson Street bar area.  People were starting to come out of the bars and congregate in the street as the bars prepared to close.  Dickson Street offers numerous locations where a weapon could be hidden, such as shrubbery and trash cans.

     5.   Under the circumstances described by Officers Murphy and Wright, the Court has no hesitation in finding that the questions about the shotgun were reasonably prompted -- at least in part -- by a concern for public safety, rather than being designed solely to elicit testimonial evidence from Watters.  In an area where bars are concentrated, people are inebriated, and volatile situations are routine, police officers cannot lightly discount a report that an intoxicated person is trying to buy methamphetamine, claiming to have a shotgun, and stating that he is not going back to prison.  The mix of a person seeking a dangerous drug -- one often associated with violence -- with an extremely destructive weapon and a desperate attitude is a virtual recipe for violence.  The police had no way of knowing, before they asked, whether Watters had a gun and if so, where it was and whether it might be located somewhere that it might fall into the hands of other people on Dickson Street.  While Watters' statements in response to questions about the shotgun did tend to

incriminate him, they were not designed solely for that purpose, but clearly had to do with locating and securing the weapon.

6.  Watters contends that the search of the van violated his Fourth Amendment rights, because he was too intoxicated to give consent.  He argues that "[i]t is illogical to conclude that a citizen whose level of intoxication was so high that Officer Wright believed said citizen should be deprived of his freedom, could simultaneously possess the mental faculties to understand the gravity of his decision to give voluntary and informed consent to search is vehicle."

Intoxication, considered in a vacuum, does not necessarily make a person incapable of consenting to a search. In **U.S. v. Perry**, **437 F.3d 782, 785 (8th Cir. 2006),** the court listed eleven factors to be considered in determining whether consent to search was valid under a totality of the circumstances analysis.  These factors are:

*   defendant's age;
*   defendant's general education and intelligence;
*   whether defendant was intoxicated;
*   whether defendant was told he had the right to withhold consent or told of his rights under **Miranda**;
*   whether he was aware of procedural protections because of previous arrests;
*   the length of time he was detained and questioned;

   *   whether he was threatened, intimidated or punished by the police;

   *   whether he relied on promises by the police;

   *   whether he was in custody or under arrest when consent was given;

   *   whether he was in a public or secluded place; and

   *   whether he objected to the search or stood by silently while it occurred.

The Court finds that under the totality of the circumstances in this case, Watters gave valid consent to the search of the van. Although Watters was intoxicated, under arrest, and gave consent before being read the **Miranda** warnings, the remaining factors outweigh these. Watters' physical appearance in court was that of a man of mature years, and he had a criminal history that would necessarily have familiarized him with the procedural safeguards available under our system of laws. He was not detained or questioned for very long before giving consent -- the entire incident, from first contact until completion of search, lasted less than an hour.[1] There were no threats or intimidations, and indeed, Watters requested and received a hug from Officer Wright.

---

[1] Watters contends that the shortness of the time span favors his position that consent was not voluntary, under Brown v. Illinois, 422 U.S. 590 (1975) and U.S. v. Yousif, 308 F.3d 820 (8th Cir. 2002). Those cases are not on point, having had under consideration the issue of whether subsequent Miranda warnings or consent could purge the taint of a seizure that was initially illegal, based on "significant intervening events." Here, the Court has found that no illegality led the police officers to the van, and the fact that they did not spend a great deal of time attempting to obtain consent is probative of voluntariness.

There were no promises made.  To the contrary, Officer Wright specifically told Watters he could not make any deals.  The search occurred in a public place, and Watters did not object to it.  When all these circumstances are considered together, as they must be under Eighth Circuit law, the Court finds that Watters -- although intoxicated -- was still capable of giving consent for the search of the van.

There is a second reason that search of the van did not violate the Fourth Amendment.  When he approached the van, Officer Murphy could see the stock of a partially-concealed weapon, and a bandolier containing shotgun shells, through the window of the van.  In addition, Officer Murphy knew from his NCIC check that Watters was a sex offender in delinquent status, and had both drug and weapons charges against him.  These facts created a fair probability that evidence of the crime of being a felon in possession of a weapon would be found in the van.  These facts would have justified a warrantless search of the van even if Watters had not consented.  **U.S. v. West**, --- F.3d ---, **2008 WL 2338129 (8th Cir. 2008).**

**IT IS THEREFORE ORDERED** that defendant's **Motion To Suppress** (document #16) is **denied.**

**IT IS SO ORDERED,** this 2nd day of July, 2008.

>  **/s/Jimm Larry Hendren**
>  **JIMM LARRY HENDREN**
>  **UNITED STATES DISTRICT JUDGE**